IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANIWAY T. JUDAVAR, MARIVIC ) <br> DESUASIDO, JUDITH FUENTES PAREJA, and ) <br> CARNISAH CALIM, ) <br>     c/o Jenner & Block LLP ) <br>     1099 New York Avenue NW ) <br>     Suite 900 ) <br>     Washington, DC 20009 ) <br>      ) <br>      Plaintiffs, ) <br>             v. ) <br>      ) <br> ESSA MOHAMED AL MANNAI, ) <br> HAYA ALKUBAISI, ) <br> WEDHAD ALDASORI AL MANNAI, and ) <br> HAMAD MOHAMED AL MANNAI, ) <br>      ) <br>      Defendants. ) | Civil Action No. <br><br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

Aniway Judavar, Marivic Desuasido, Judith Fuentes Pareja, and Carnisah Calim ("Plaintiffs"), by and through counsel, allege as follows:

PRELIMINARY STATEMENT

1.      This is an action for damages brought by Plaintiffs, four women trafficked into the United States and held in forced labor as domestic servants in the home of a Qatari official and his wife, Defendant Essa Mohamed Al Mannai ("Defendant Essa Al Mannai") and Defendant Haya Alkubaisi ("Defendant Alkubaisi") (collectively, the "Qatari Foreign Official Defendants").  Human trafficking includes the recruitment, harboring, transportation, provision, or obtaining of a person through the use of force, fraud, or coercion for the purpose of subjection to servitude, peonage, debt bondage, or slavery.

2.      The Qatari Foreign Official Defendants conspired with family members in
Qatar to traffic Plaintiffs into the United States, one by one.  Defendant Essa Al Mannai's
mother, Wedhad Aldasori Al Mannai ("Defendant Aldasori"), and Defendant Essa Al Mannai's
brother, Defendant Hamad Mohamed Al Mannai ("Defendant Hamad Al Mannai") (collectively,
the "Al Mannai Family Defendants"), recruited the women from their home countries using
Qatar-based labor-brokering agencies.  The Al Mannai Family Defendants signed contracts to
employ the women as domestic workers in their homes in Qatar.  However, once the women
arrived in Qatar, the Al Mannai Family Defendants arranged for fraudulent visas at the U.S.
Embassy, made travel arrangements, and sent the women to the United States.

3.      The Qatari Foreign Official Defendants and the Al Mannai Family
Defendants (collectively, the "Defendants") conspired to transport the women to the United
States to serve as nannies and housekeepers in the Qatari Foreign Official Defendants' six-
bedroom home in Vienna, Virginia.

4.      Upon information and belief, the Al Mannai Family Defendants entered
into contracts with the Plaintiffs for work in Qatar.

5.      Upon information and belief, the Qatari Foreign Official Defendants
entered into contracts with the Plaintiffs for work in the United States.  Under those contracts,
submitted to the U.S. Embassy in Qatar to obtain A-3 visas, the Qatari Foreign Official
Defendants promised to pay the Plaintiffs the federal minimum wage, and to provide free
housing and board, as well as one day off each week.  However, once the women arrived in the
United States, the Qatari Foreign Official Defendants refused to honor their contracts.  Instead,
the Qatari Foreign Official Defendants forced the women to work around the clock, cleaning
their home and caring for four young children.  Rather than paying U.S. minimum wage, as

promised in their contracts, the Qatari Foreign Official Defendants paid the women between $400 and $500 *per month*, or 0.55 to 0.69 cents per hour.

6.     The Qatari Foreign Official Defendants refused to allow the Plaintiffs to leave the house alone or to speak to anyone outside the suburban home of the Qatari Foreign Official Defendants.  Physically isolated in a foreign country, unable to take public transportation, and frightened of the consequences of leaving their employers, the Plaintiffs suffered from severe isolation and believed that they had no option but to remain in the Defendants' house.

7.     The Qatari Foreign Official Defendants restricted the women's access to the telephone and curtailed their contact with the outside world.  The Qatari Foreign Official Defendants forced Plaintiffs to work seven days a week, refusing to provide them with any time off.  The women were on call 24 hours each day.

8.     When the Qatari Foreign Official Defendants' son entered the hospital for extended stays, the Qatari Foreign Official Defendants demanded that the child's caretakers move into the hospital and live in the child's hospital room for months at a time.  The nanny was not permitted to leave the hospital ward for any reason.  Defendant Essa Al Mannai called the telephone next to the hospital bed periodically to make sure that the nanny was at her post.  With inadequate food or rest, each of the Plaintiffs desperately searched for avenues to escape their employers.

9.     The Qatari Foreign Official Defendants held one of the women's passports for more than a year and another's for about seven months, making it impossible for them to escape.

10.     Defendant Alkubaisi psychologically abused the women, screaming at them, calling them profane names, and humiliating them.  The Qatari Foreign Official Defendants told the women that the United States is a dangerous country and warned that they would be harmed if they tried to leave the Qatari Foreign Official Defendants' employ or home.

11.     Each of the women believed that they could not leave the Qatari Foreign Official Defendants' home, fearing that they would be deported if they left their employer.  Each woman also feared that, if she escaped alone, the second domestic worker in the house would be punished severely.

12.     In addition to the psychological abuse meted out by Defendant Alkubaisi, Defendant Essa Al Mannai also sexually assaulted one of the Plaintiffs on multiple occasions in the home.

13.     With the help of two separate Good Samaritans, one in June 2010 and one in December 2010, the Plaintiffs managed to escape from the Qatari Foreign Official Defendants' home in pairs.

14.     The Defendants fraudulently misused the A-3 visa scheme to traffic and exploit a succession of domestic workers in the United States.  When the first pair of domestic workers, Ms. Judavar and Ms. Calim, escaped from the Qatari Foreign Official Defendants' home on June 6, 2010, the Defendant Essa Al Mannai contacted his mother in Qatar, Defendant Aldasori, who immediately sent a domestic worker, Ms. Desuasido, to the United States. Defendant Aldasori used the same scheme that she had used to traffic Ms. Judavar and Ms. Calim, procuring A-3 visas using a false contract for employment in the United States.

15.     In addition, Defendant Aldasori recruited an additional domestic worker, Ms. Pareja, whom she sent to the Qatari Foreign Official Defendants in the United States. Upon information and belief, Defendant Aldasori obtained these domestic workers through a labor-brokering agency in Qatar. The U.S. Embassy in Qatar issued additional A-3 visas to Ms. Desuasido and Ms. Pareja within days of receiving the requests from the Al Mannai Family Defendants.

16.     Ms. Desuasido and Ms. Pareja, both sent to the United States after Ms. Judavar's and Ms. Calim's escape, soon discovered that the labor conditions in the Qatar Foreign Official Defendants' home were abusive and exploitative. The Qatar Foreign Official Defendants demanded that they remain on call 24 hours each day, provided no days off, and required Ms. Pareja, who served as the sick child's nanny, to sleep with the child in his room. As with Ms. Judavar and Ms. Calim, Defendant Alkubaisi frequently screamed at the workers in Arabic, calling them "hiwana" (animal), "anti matimok" (brainless), "majnoun" (crazy), "khaisa" (incompetent), "muja" (son of a bitch), and "zeg" (shit). Defendant Alkubaisi told the Plaintiffs that they had no rights, but were just "kadama" (maids). The children in the home, hearing their mother utter such insults, also yelled profanity and insults at the Plaintiffs.

17.     On December 12, 2010, Ms. Pareja and Ms. Desuasido escaped the Qatari Foreign Official Defendants' home with the assistance of a Good Samaritan. Upon information and belief, the Defendants used the same labor recruiting scheme to bring in two additional domestic workers, at least one of whom remains in the Qatari Foreign Official Defendants' home to this day.

18.     The Plaintiffs seek damages from the Qatari Foreign Official Defendants for trafficking them into the United States for forced labor. One Plaintiff seeks additional

damages for sexual assault.  The Plaintiffs also seek damages from all of the Defendants for breach of contract and fraud.  The Plaintiffs seek compensation for their labor at the rate they were promised in the contracts, or at least at federal minimum wage.  The Plaintiffs additionally seek damages for various state-law torts.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1351, and 1367.  Further, this Court also has subject matter jurisdiction pursuant to 29 U.S.C. § 216(b), which permits employees to bring civil actions in courts of appropriate jurisdiction to recover damages for an employer's failure to pay the minimum wage and overtime wages, and 18 U.S.C. § 1595, which permits civil actions for violations of the forced labor and trafficking provisions of the Victims of Trafficking and Violence Protection Act of 2000.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(d), because Defendants are citizens of a foreign state.

**PARTIES**

21.     Plaintiff Carnisah Calim is a citizen of Indonesia.  At the time of the events that give rise to this Complaint, Ms. Calim was legally residing in the United States under a duly issued A-3 visa, a visa given to employees of foreign officials.  8 U.S.C. § 1101(a)(15)(A)(iii).  Ms. Calim worked for the Qatari Foreign Official Defendants in the United States from approximately November 12, 2008, until her escape on June 6, 2010.  Ms. Calim currently lives in Maryland.

22.     Plaintiff Aniway Judavar is a citizen of the Philippines.  At the time of the events that give rise to this Complaint, Ms. Judavar was legally residing in the United States

under a duly issued A-3 visa.  Ms. Judavar worked for the Qatari Foreign Official Defendants in the United States from approximately April 26, 2009, until her escape on June 6, 2010.  Ms. Judavar currently lives in Maryland.

23.     Plaintiff Marivic Desuasido is a citizen of the Philippines.  At the time of the events that give rise to this Complaint, Ms. Desuasido was legally residing in the United States under a duly issued A-3 visa.  Plaintiff Desuasido worked for the Qatari Foreign Official Defendants in the United States from approximately June 14, 2010, until her escape on December 12, 2010.  She currently resides in Maryland.

24.     Plaintiff Judith Fuentes Pareja is a citizen of the Philippines.  At the time of the events that give rise to this Complaint, Ms. Pareja was legally residing in the United States under a duly issued A-3 visa.  Ms. Pareja worked for the Qatari Foreign Official Defendants in the United States from approximately July 30, 2010, until her escape on December 12, 2010.  She currently resides in Virginia.

25.     Upon information and belief, the Defendant Essa Mohamed Al Mannai is a citizen of Qatar who currently resides in Washington, D.C.  At all times relevant hereto, Defendant Essa Al Mannai was stationed in Washington, D.C., as a foreign official working for the Embassy of Qatar.  He resided, along with his wife, Defendant Alkubaisi, and their four children at 8093 Westchester Drive, Vienna, Virginia.

26.     Upon information and belief, Defendant Haya Alkubaisi is a citizen of Qatar who currently resides in Washington, D.C.  At all times relevant hereto, Defendant Alkubaisi lived in Vienna, Virginia, and resided, along with her husband, Defendant Essa Al Mannai, and their four children at 8093 Westchester Drive, Vienna, Virginia.

27.     Upon information and belief, Defendant Wedhad Aldasori Al Mannai is a citizen of Qatar who currently resides in Doha, Qatar.

28.     Upon information and belief, Defendant Hamad Al Mannai is a citizen of Qatar who currently resides in Doha, Qatar.

## BACKGROUND

29.     Plaintiffs are survivors of forced labor and human trafficking, as defined by the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464, a statute that seeks to prevent human trafficking and forced labor.

30.     As defined by the TVPA, "severe forms of trafficking in persons" include "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 22 U.S.C. § 7102(8)(B).  Traffickers coerce their victims into performing labor through a variety of means, including, *inter alia*, physical abuse, psychological abuse, threats, isolation, and confinement.

31.     According to the U.S. Department of State's 2010 Trafficking in Persons Report, available at http://www.state.gov/g/tip/rls/tiprpt/2010/142761.htm, Qatar does not comply with the minimum standards to combat human trafficking.  The State Department reports:

> Men and women from Nepal, India, Pakistan, Bangladesh, the Philippines, Indonesia, Vietnam, Sri Lanka, Ethiopia, Sudan, Thailand, Egypt, Syria, Jordan, and China voluntarily travel to Qatar as laborers and domestic servants, but some subsequently face conditions indicative of involuntary servitude.  These conditions include threats of serious physical or financial harm; job switching; the withholding of pay; charging workers for benefits for which the employer is responsible; restrictions on freedom of movement, including the confiscation of passports and travel documents and the

withholding of exit permits; arbitrary detention; threats of legal action and deportation; false charges; and physical, mental, and sexual abuse.

32.    In a Circular Diplomatic Note dated May 20, 1996, the State Department notified all foreign states with a diplomatic presence in the United States, including Qatar, that "the Department [was] concerned to learn of problems which continue to arise in the working relationships between some members of the diplomatic and consular community and their personal household employees," including "instances where wages have been withheld from personal domestics for undue periods, where the wages actually paid are substantially less than those stipulated at the time of employment, where passports have been withheld from the employee, where the actual number of working hours weekly is substantially more than those originally contemplated and with no additional pay, and where the employee has been forbidden from leaving the employer's premises even though off duty."

33.    On June 19, 2000, the State Department sent a second Circular Diplomatic Note to foreign missions, including Qatar, reiterating the legal obligations of diplomats to their domestic workers. This Circular also communicated the State Department's requirement that diplomatic employers execute and include an employment contract in full compliance with United States law in all A-3 visa applications.

## FACTUAL ALLEGATIONS

### FRAUDULENT RECRUITMENT THROUGH QATAR

34.    The Plaintiffs are all women from impoverished families in the Philippines and Indonesia. During the period that the Plaintiffs were employed by the Qatari Foreign Official Defendants in the United States, they each bore significant responsibility to provide financial support to their children, husbands, parents, and/or extended families. The women sent

the small amounts of money that they earned in the United States back to their families in their home countries.

35.     The Qatari Foreign Official Defendants brought the Plaintiffs into the United States on A-3 visas obtained with fraudulent employment contracts. All of the Defendants intended to violate United States law, as well as their contractual obligations.

**Ms. Calim**

36.     Plaintiff Carnisah Calim was born in Indramayu, Indonesia. During the time of her employment by the Defendants, she spoke Indonesian, Arabic, and a small amount of basic English.

37.     On or about June 3, 2008, Ms. Calim traveled to Qatar to work for Defendant Aldasori, Defendant Essa Al Mannai's mother, as a domestic servant. Ms. Calim had a two-year employment contract to work in Defendant Aldasori's home in Qatar. After just five months in Qatar, she was informed that she would be working for Defendant Aldasori's son in the United States, Defendant Essa Al Mannai. Believing this to be an opportunity to earn more money to send home to her family and relying on the promises and representations made, Ms. Calim agreed to travel to the United States to work.

38.     In or about October 2008, Ms. Calim went to the U.S. Embassy in Qatar with Defendant Hamad Al Mannai to obtain an A-3 visa. Because Ms. Calim spoke almost no English, Defendant Hamad Al Mannai participated in the interview with the consular official. Ms. Calim said nothing. She did not receive a copy of a written contract for employment in the United States, but was informed by Defendant Aldasori that she would be paid twice what she earned in Qatar. Ms. Calim relied on those statements and representations.

39.     On November 12, 2008, Ms. Calim traveled alone to the United States and immediately began caring for all four of the Qatari Foreign Official Defendants' children, cooking the family's meals, and cleaning the entire house.  At the time, she was the only domestic worker in the house.

40.     Defendant Essa Al Mannai seized Ms. Calim's passport immediately upon her arrival in the United States.

41.     On multiple occasions, Defendant Essa Al Mannai sexually assaulted Ms. Calim.

42.     Ms. Calim remained in the Qatari Foreign Official Defendants' home until June 6, 2010, when she fled with the assistance of a Good Samaritan.

**Ms. Judavar**

43.     Ms. Judavar was born in Caloocan City, the Philippines.

44.     On or about March 7, 2009, Ms. Judavar traveled to Qatar to work as a domestic servant for Defendant Hamad Al Mannai and Defendant Aldasori.

45.     Immediately upon arrival in Qatar, Ms. Judavar was informed that she would not be working for the Al Mannai Family Defendants in Qatar, but instead would travel to the United States to work for Defendant Essa Al Mannai.  Believing this to be an opportunity to earn more money to send home to her family and relying on the promises and representations made, Ms. Judavar agreed to travel to the United States to work.

46.     In March 2009, just days after her arrival in Qatar, Ms. Judavar went to the U.S. Embassy in Qatar with Defendant Hamad Al Mannai to obtain an A-3 visa.  Defendant Hamad Al Mannai, who accompanied her throughout the visit to the U.S. Embassy, provided an

employment contract, which he asked her to sign. The contract promised that Ms. Judavar would be paid $7.25 per hour, would work 40 hours each week, and would have one day off each week.

47.    Upon information and belief, Defendant Essa Al Mannai never intended to carry out the provisions of the contract, but provided the contract merely to obtain a United States A-3 visa for Ms. Judavar.

48.    On April 26, 2009, Ms. Judavar traveled alone to the United States and immediately began caring for the Qatari Foreign Official Defendants' young son, who was seriously ill. Defendant Essa Al Mannai seized Ms. Judavar's passport immediately upon her arrival in the United States.

49.    Ms. Judavar joined Ms. Calim as a domestic worker in the Qatari Foreign Official Defendants' home in Virginia. Ms. Judavar began caring for the Defendants' son, who was three years old at the time and required round-the-clock care. Ms. Judavar either slept on the floor in the child's room, in a bed with the child, or sometimes on a small bed adjoining the child's bed.

50.    Ms. Judavar and Ms. Calim remained in the Defendants' home until June 6, 2010, when, with the help of a Good Samaritan, they fled.

**Ms. Desuasido**

51.    Plaintiff Marivic Desuasido was born in Brillante, Prieto Diaz Sorsogon, the Philippines. During the time of her employment by the Defendants, she spoke only Arabic and Tagalog. She did not speak English.

52.    On or about March 31, 2009, Ms. Desuasido traveled to Qatar to work for Defendant Aldasori, Defendants Essa and Hamad Al Mannai's mother, as a domestic servant.

After fifteen months in Qatar, she was informed that she would be working for Defendant Aldasori's son, Defendant Essa Al Mannai, in the United States.  Defendant Aldasori lied to Ms. Desuasido, telling her that the previous domestic worker, Ms. Judavar, had returned the Philippines due to high blood pressure.  Defendant Aldasori also told Ms. Desuasido that her employment in the United States would involve all of the same arrangements that were in place during her employment in Qatar, including the provision of all living expenses and basic needs such as soap and shampoo.

53.     Believing this to be an opportunity to earn more money to send to her family at home, Ms. Desuasido agreed to travel to the United States to work.

54.     On June 11, 2010, Ms. Desuasido went to the U.S. Embassy in Qatar with Defendant Hamad Al Mannai to obtain an A-3 visa.  Defendant Hamad Al Mannai read a contract to her in English and orally translated the contract into Arabic.  He asked her to sign the contract, which she did, but he did not give her a copy.  Upon information and belief, Defendant Hamad Al Mannai lied and made misrepresentations about the contents of the contract.  He then used the written version, which Ms. Desuasido could not read, to obtain an A-3 visa.  Upon information and belief, that contract provided for payment of $7.25 per hour, a 40-hour work week, and one day off each week.

55.     Upon information and belief, Defendant Essa Al Mannai never intended to carry out the provisions of the contract, but provided the contract merely to obtain a United States A-3 visa for Ms. Desuasido.

56.     Relying on the promises and representations made, on June 14, 2010, Ms. Desuasido traveled alone to the United States and began caring for all four of the Defendants' children on June 15, 2010.

57.     Defendant Essa Al Mannai seized Ms. Desuasido's passport the morning after her arrival in the United States.  It was later returned to her by Defendant Essa Al Mannai.

58.     Upon arrival in the United States, Ms. Desuasido had to use her meager income to pay for necessities such as soap and shampoo.

59.     Ms. Desuasido remained in the Qatari Foreign Official Defendants' home until December 12, 2010.  On that date, with the assistance of a Good Samaritan, she and her co-worker, Ms. Pareja, escaped.

**Ms. Pareja**

60.     Plaintiff Judith Fuentes Pareja was born in Naro/Cawaya Masbate, the Philippines.  During the time of her employment by the Defendants, she spoke English and Tagalog.

61.     On or about July 15, 2010, Ms. Pareja traveled to Qatar to work for Defendant Essa Al Mannai's mother, Defendant Aldasori, as a domestic servant.  After just fifteen days in Qatar, she was informed that she would be working for Defendant Aldasori's son in the United States, Defendant Essa Al Mannai.  Although she worked these fifteen days under a contract with the Al Mannai Family Defendants in Qatar, she was never paid.

62.     On or about July 21, 2010, Ms. Pareja went to the U.S. Embassy in Qatar with Defendant Hamad Al Mannai to obtain an A-3 visa.  Defendant Hamad Al Mannai provided a written employment contract, which he asked her to sign.  The contract, signed by Defendant Essa Al Mannai and fully executed, promised that Ms. Pareja would be paid $7.25 per hour, would work 40 hours each week, would have one day off each week, and would receive paid vacation.

63.     Upon information and belief, the Defendant Essa Al Mannai never intended to carry out the provisions of the contract, but provided the contract merely to obtain a United States A-3 visa for Ms. Pareja.

64.     Relying on these promises and representations, on or about July 30, 2010, Ms. Pareja traveled to the United States with Defendant Essa Al Mannai and two of his children. Upon arrival in the United States, Ms. Pareja immediately began caring for the Qatari Foreign Official Defendants' son, who was gravely ill.  She joined Ms. Desuasido in the Qatari Foreign Official Defendants' home, where Ms. Desuasido was already working as a housekeeper and nanny.

65.     Defendant Aldasori seized Ms. Pareja's passport in Qatar and gave it to Defendant Essa Al Mannai the day that they left for the United States.  Defendant Essa Al Mannai retained the passport after their arrival in the United States.  It was later returned to her.

## FORCED LABOR AND EXPLOITATION IN THE UNITED STATES

66.     At all relevant times, the Plaintiffs resided in the home of the Al Mannai Family Defendants' home in Qatar, the Qatari Foreign Official Defendants' home at 8093 Westchester Drive, Vienna, Virginia, or in a hospital room at Georgetown University Hospital in the District of Columbia.

67.     The Qatari Foreign Official Defendants forced the Plaintiffs to work for illegally low pay in violation of U.S. law and compelled their work through mental and legal coercion, including humiliation and verbal abuse.  Although the women worked around the clock without any days off, they were paid only $400 to $500 per month, or between 0.55 and 0.69 cents per hour.

68.    The Qatari Foreign Official Defendants controlled all of the women's movements, refusing to allow them to go shopping unescorted, go for walks outside the home, or speak or meet with anyone.  Defendant Alkubaisi frequently berated and yelled at the Plaintiffs, calling them insulting names and criticizing their work.  The Plaintiffs lived in a state of systematic and constant psychological abuse.  Falsely imprisoned in the Qatari Foreign Official Defendants' house, the Plaintiffs were unable to identify any means of escape.

Work Responsibilities

69.    The Qatari Foreign Official Defendants forced the Plaintiffs to perform arduous and demanding work virtually every waking hour of the day.  Their duties were by and large split into two jobs: one domestic worker, the "housekeeper," cleaned the entire house, prepared all meals, and cared for three of the children.

70.    The second domestic worker, the "nanny," was required to devote herself 24 hours each day to the Qatari Foreign Official Defendants' seriously ill child.  The Qatari Foreign Official Defendants required the housekeeper to work sixteen to nineteen hours – or more – per day, seven days per week.  The housekeeper began work between 5:30 and 7:00 a.m.  The work days ended at approximately 11:00 p.m. each night.  Her duties included preparing the children for school, making breakfast for the entire family, washing the baby, dressing the baby, cleaning the entire house, doing all of the family's laundry, dusting and vacuuming every day, cooking dinner, putting the children to bed, taking out the garbage, washing the dinner dishes, and cleaning the kitchen.

71.    The nanny was required to spend every moment with the Qatari Foreign Official Defendants' sick child.  The nanny slept in the child's room and responded to his demands throughout the night, including changing his diapers and performing medical

16

procedures.  The sick child, who was between three years old and six years old at the time of

these events, entered the hospital for extended stays on multiple occasions.  When this occurred,

the nanny was expected to go with him and *to live in the hospital*.

72.     Ms. Judavar, who first worked as the nanny, lived at the hospital for three

months, sleeping in the family lounge or in the chair next to the child's bed.  She was required by

the Qatari Foreign Official Defendants to change the child's diaper in the night and attend to all

of his needs.  She was not permitted to use the hospital phone, except to call the Qatari Foreign

Official Defendants, or to speak to strangers.  Defendant Essa Al Mannai would call the hospital

room periodically to ensure that she was at her station next to the child's bed.  Defendant Essa Al

Mannai would provide Ms. Judavar with $20 for food at the hospital every three days.  She was

not permitted to leave the hospital under any circumstances.

73.     Ms. Pareja, who worked as the nanny after Ms. Judavar's escape, also

lived at Georgetown University Hospital when the Qatari Foreign Official Defendants' son was

hospitalized for weeks at a time.  Like Ms. Judavar, she lived in the family lounge and in the

child's hospital room.  She also lacked sufficient money to purchase food during the periods she

lived in the hospital.  As with Ms. Judavar, Defendant Essa Al Mannai called the hospital

frequently to check on his son and confirm that Ms. Pareja was at her post at the child's bedside.

**ESCAPE FROM THE QATARI FOREIGN OFFICIAL DEFENDANTS' HOUSE**

74.     In June 2010, Ms. Judavar and Ms. Calim decided that they could no

longer tolerate the psychological, physical, and sexual abuse in the Qatari Foreign Official

Defendants' house.  Ms. Calim was terrified that the sexual abuse she suffered would escalate.

Ms. Judavar feared that Defendant Essa Al Mannai would continue to attack, harass, and

sexually assault Ms. Calim.  Ms. Judavar was also terrified that Defendant Essa Al Mannai
would sexually assault her as well.

75.     With assistance from a Good Samaritan, the two women fled the house at
4:00 a.m. in a taxicab.  In preparation for their escape, the women had propped a window open.
They fled through the window to avoid opening a door, which would have sounded the security
alarm and alerted the Qatari Foreign Official Defendants to their flight.

76.     Similarly, six months later, in December 2010, Ms. Pareja and Ms.
Desuasido decided to run away from the Qatari Foreign Official Defendants' home to escape the
psychological abuse and forced labor that they had suffered as employees.  With the assistance of
an unrelated Good Samaritan, the two domestic workers fled through a basement door that they
had propped open earlier in the evening to avoid triggering the alarm.

77.     After escaping the Qatari Foreign Official Defendants' home, the
Plaintiffs called the National Human Trafficking Hotline and secured social services and *pro
bono* legal assistance.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### TRAFFICKING IN PERSONS VIOLATION OF THE TRAFFICKING VICTIMS
### PROTECTION ACT OF 2000
### (AGAINST THE QATARI FOREIGN OFFICIAL DEFENDANTS)

78.     Plaintiffs reallege and incorporate the averments of the foregoing
paragraphs as though set forth fully herein.

79.     The Qatari Foreign Official Defendants knowingly recruited, transported,
and harbored the Plaintiffs so as to obtain their labor and services by scheme or pattern of

behavior and/or abuse of legal process within the meaning of the Trafficking provisions of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1590.

80.     The Plaintiffs are authorized to bring these civil claims against the Qatari Foreign Official Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

81.     As a proximate result of the Qatari Foreign Official Defendants' conduct, the Plaintiffs have suffered damages.

82.     The Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

**SECOND CLAIM FOR RELIEF:**
**FORCED LABOR VIOLATION OF THE TRAFFICKING**
**VICTIMS PROTECTION ACT OF 2000**
**(AGAINST THE QATARI FOREIGN OFFICIAL DEFENDANTS)**

83.     Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

84.     The Qatari Foreign Official Defendants knowingly obtained the Plaintiffs' labor and services by threats of serious harm and by a scheme or pattern of behavior and/or abuse of legal process within the meaning of the Forced Labor provision of the Trafficking Victims Protection Act, 18 U.S.C. § 1589.

85.     The Plaintiffs are authorized to bring these civil claims against the Qatari Foreign Official Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

86.     As a proximate result of the Qatari Foreign Official Defendants' conduct, the Plaintiffs have suffered damages.

87.     The Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

### THIRD CLAIM FOR RELIEF:
### VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (AGAINST THE QATARI FOREIGN OFFICIAL DEFENDANTS)

88.     Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

89.     The Qatari Foreign Official Defendants employed the Plaintiffs within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. § 203(d).

90.     Pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201, *et seq.* and United States Department of Labor regulations, the Qatari Foreign Official Defendants were obligated to pay the Plaintiffs at least the minimum wage of $7.25 for every hour in which the Plaintiffs were not free to leave employers' premises.

91.     The Qatari Foreign Official Defendants willfully refused to pay the Plaintiffs minimum wage, in violation of 29 U.S.C. § 206(a), (f) and Department of Labor regulations.

92.     As a proximate result of the Qatari Foreign Official Defendants' conduct, the Plaintiffs have suffered damages.

93.     The Plaintiffs are entitled to recover the amount of unpaid minimum wages due, an amount no less than $208,478 for all four Plaintiffs. The Plaintiffs are also entitled to recover liquidated damages, bringing the total statutory damages to $416,956. The

Plaintiffs are also entitled to recover attorneys' fees and costs of the action, pursuant to 29 U.S.C. § 216(b) and Department of Labor regulations, in addition to declaratory relief.

## FOURTH CLAIM FOR RELIEF:
## BREACH OF CONTRACT
## (AGAINST ALL DEFENDANTS)

94.     The Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

95.     Upon information and belief, the Al Mannai Family Defendants in Qatar entered into two-year contracts with each of the Plaintiffs to work in the family's household in Qatar. The Plaintiffs, however, were sent to the United States, in breach of the original contract.

96.     Upon information and belief, in order to obtain A-3 visas for the four Plaintiffs, the Defendants created and executed new contracts for each of the Plaintiffs. Those contracts provided for eight-hour days, six-day weeks, vacation time, and a pay rate of minimum wage. The contracts complied with U.S. law.

97.     The Plaintiffs fully performed under their respective contracts by working as domestic workers in the Qatari Foreign Official Defendants' household in the United States and the Al Mannai Family Defendants' household in Qatar.

98.     The Defendants breached the contracts by failing to pay the Plaintiffs for all of the work they performed, paying them illegally low wages, and by forcing the Plaintiffs to work around the clock, seven days per week.

99.     As a proximate result of the Qatari Foreign Official Defendants' conduct, the Plaintiffs have suffered damages.

100.    The Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## FIFTH CLAIM FOR RELIEF:
## QUANTUM MERUIT
## (AGAINST ALL DEFENDANTS)

101.    The Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

102.    The Plaintiffs have conferred significant benefits upon the Defendants by performing the above-mentioned labor for them.

103.    The Defendants have not tendered appropriate payment to the Plaintiffs for these services.

104.    The Defendants are liable under quantum meruit for the services that the Plaintiffs provided.

105.    As a proximate result of the Defendants' conduct, the Plaintiffs have suffered damages.

106.    The Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## SIXTH CLAIM FOR RELIEF:
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

107.    The Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

108.    Defendants have been unjustly enriched because they failed to pay the Plaintiffs the value of the Plaintiffs' labor.

109.    As a proximate result of the Defendants' conduct, the Plaintiffs have suffered damages.

110.    It would be inequitable for the Defendants to be permitted to retain such benefits without paying the Plaintiffs the value of the benefits conferred.

111.    The Plaintiffs are entitled to restitution and judgment against the Defendants in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## SEVENTH CLAIM FOR RELIEF: FRAUD AND CONSTRUCTIVE FRAUD (AGAINST ALL DEFENDANTS)

112.    The Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

113.    The Defendants intentionally, knowingly, negligently, and/or innocently misrepresented to the Plaintiffs the conditions of the Plaintiffs' employment in the United States in order to induce them to come to the United States.

114.    The Defendants deceived the Plaintiffs with the above-mentioned misrepresentations, including the representation that employment in the United States would result in specified, decent wages and proper working conditions, including a day off each week, in order to traffic the Plaintiffs into the United States and to force them to work as domestic workers in the Defendants' household.  The Defendants induced the Plaintiffs to come to the United States knowing of and intending that their misrepresentations would induce the Plaintiffs to travel to the United States in order to receive the described employment.

115.    These misrepresentations were of material facts.

116.    The Plaintiffs did in fact rely on the Defendants' misrepresentations to their detriment and, as a result, were forced to work as domestic workers for the Defendants for illegally low pay, and were denied their freedom and human rights.

117.    As a proximate result of the Plaintiffs' reliance on the Defendants' misrepresentations inducing employment, the Plaintiffs have endured sexual and psychological abuse at great economic, physical, and emotional harm.

118.    At the time that the Defendants made the foregoing misrepresentations and promises to the Plaintiffs, the Defendants had no intention of carrying out such representations.

119.    As a direct and proximate result of these actions, the Plaintiffs have sustained damages.

120.    The Plaintiffs are entitled to restitution and judgment against the Defendants in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF:
### FALSE IMPRISONMENT
### (AGAINST THE QATARI FOREIGN OFFICIAL DEFENDANTS)

121.    The Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

122.    The Qatari Foreign Official Defendants knowingly and intentionally restrained the Plaintiffs through threats and coercion so as to deprive the Plaintiffs of their liberty and force the Plaintiffs to continue laboring for the Defendants.

123.    The Plaintiffs reasonably believed that they were confined within the Qatari Foreign Official Defendants' home as a result of Defendant Alkubaisi's constant

psychological abuse and Defendant Essa Al Mannai's sexual violence against one of the Plaintiffs.

124.   As a proximate result of the Qatari Foreign Official Defendants' conduct, the Plaintiffs have suffered damages.

125.   The Qatari Foreign Official Defendants committed these acts maliciously, with the wrongful intention of causing harm to the Plaintiffs and in conscious disregard of their rights.

126.   The Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

### NINTH CLAIM FOR RELIEF:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST THE QATARI FOREIGN OFFICIAL DEFENDANTS)

127.   The Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

128.   The Qatari Foreign Official Defendants acted with an intent to humiliate, cause the Plaintiffs emotional distress and/or a reckless disregard for the high probability that emotional distress would occur by, among other things, refusing the Plaintiffs contact with the world outside the Qatari Foreign Official Defendants' home, telling the Plaintiffs that they would be harmed if they left the home, regularly screaming at them and berating them, depriving them of liberty and wages, and subjecting them to abhorrent working conditions.

129.   The Qatari Foreign Official Defendants' conduct was extreme and outrageous in nature and intolerable in a civilized society.

130.    As a proximate result of the Qatari Foreign Official Defendants' conduct, the Plaintiffs have suffered and continue to suffer severe mental distress, emotional injuries, and economic loss.

131.    The Qatari Foreign Official Defendants committed these acts maliciously and oppressively, with the wrongful intention of causing harm to the Plaintiffs, with the motive amounting to malice and in conscious disregard of the Plaintiffs' rights.

132.    The Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the costs of this action.

## TENTH CLAIM FOR RELIEF:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (PLAINTIFF CARNISAH CALIM AGAINST DEFENDANT ESSA AL MANNAI)

133.    Plaintiff Carnisah Calim realleges and incorporates the averments of the foregoing paragraphs as though set forth fully herein.

134.    Defendant Essa Al Mannai negligently engaged in outrageous conduct toward Ms. Calim and caused Ms. Calim to suffer severe emotional distress.

135.    Defendant Essa Al Mannai owed a duty to Ms. Calim because it was reasonably foreseeable that sexually assaulting Ms. Calim would cause her to suffer severe emotional distress.

136.    Defendant Essa Al Mannai breached his duty to Ms. Calim by negligently engaging in the conduct described herein.

137.    As a proximate result of said conduct, Ms. Calim has suffered and continues to suffer extreme mental distress, humiliation and emotional injuries. As a direct and

natural result of the fright and shock caused by Defendant Essa Al Mannai's conduct, Ms. Calim has suffered physical injuries.

138.    Ms. Calim is entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

### ELEVENTH CLAIM FOR RELIEF:
### ASSAULT
### (PLAINTIFF CARNISAH CALIM AGAINST DEFENDANT ESSA AL MANNAI)

139.    Plaintiff Carnisah Calim realleges and incorporates the averments of the foregoing paragraphs as though set forth fully herein.

140.    Defendant Essa Al Mannai's sexual assault of Ms. Calim was intended to cause harmful and/or offensive contact and/or the apprehension of imminent harmful and/or offensive contact with the Plaintiff.

141.    As a direct and proximate result of the sexual assaults on Ms. Calim perpetrated by Defendant Essa Al Mannai, Ms. Calim was placed in apprehension of imminent harmful and/or offensive physical contact.

142.    As a direct and proximate result of the actions and/or words of Defendant Essa Al Mannai, Ms. Calim has endured continuing pain and suffering, in addition to severe emotional distress and loss of income.

143.    Ms. Calim is entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the costs of this action.

## TWELFTH CLAIM FOR RELIEF:
### BATTERY
### (PLAINTIFF CARNISAH CALIM AGAINST DEFENDANT ESSA AL MANNAI)

144.   Plaintiff Carnisah Calim realleges and incorporates the averments of the foregoing paragraphs as though set forth fully herein.

145.   Defendant Essa Al Mannai engaged in continuous harmful and/or offensive physical and sexual contact with Ms. Calim, including grabbing, poking, holding, and sexually assaulting Ms. Calim on multiple occasions.

146.   At no time did Ms. Calim consent to the above harmful and offensive physical and sexual contact by Defendant Essa Al Mannai.

147.   Defendant Essa Al Mannai's physical and sexual contact with the Plaintiff was inexcusable, offensive, unjustified, uninvited, and unwelcome.

148.   As a direct and proximate result of Defendant Essa Al Mannai's physical and sexual attacks on Ms. Calim, she has endured continuing pain and suffering, in addition to humiliation and severe emotional distress and loss of income.

## THIRTEENTH CLAIM FOR RELIEF:
### CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

149.   The Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

150.   The Defendants agreed to engage in the acts detailed above to accomplish an unlawful purpose and/or accomplish acts by unlawful means.

151.   Through their concerted action, the Defendants assisted one another in the execution of those acts that resulted in the unlawful treatment of the Plaintiffs, described above.

152.    As a proximate result of the Defendants' agreement and concerted action to engage in the unlawful acts described above, the Plaintiffs have suffered and continue to suffer severe mental distress, emotional injuries and economic loss.

153.    The Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

### FOURTEENTH CLAIM FOR RELIEF:
### THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT,
### 18 U.S.C. §§ 1592 & 1595
### (PLAINTIFFS CARNISAH CALIM AND ANIWAY JUDAVAR AGAINST THE
### QATARI FOREIGN OFFICIAL DEFENDANTS)

154.    Plaintiffs Carnisah Calim and Aniway Judavar reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

155.    18 U.S.C. § 1592(a) provides that:

Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person—

(1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a);

(2) with intent to violate section 1581, 1583, 1584, 1589, 1590, or 1591; or

(3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000, shall be fined under this title or imprisoned for not more than 5 years, or both.

156.    As set forth above, the Qatari Foreign Official Defendants confiscated or possessed Ms. Calim's and Ms. Judavar's passports and other immigration documents to prevent

or restrict or to attempt to prevent or restrict their liberty to move or travel, in order to maintain their labor or services.

157.    Ms. Calim and Ms. Judavar are victims of a severe form of trafficking in persons.

158.    As a result of the Qatari Foreign Official Defendants' conduct, Ms. Calim and Ms. Judavar have suffered damages in an amount to be determined at trial.

159.    Pursuant to 18 U.S.C. § 1595, Ms. Calim and Ms. Judavar are entitled to recover damages and reasonable attorneys' fees and costs incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court grant them the following relief on each count above:

1)    Compensatory damages in the amount to be determined at trial;

2)    Punitive damages in the amount to be determined at trial;

3)    Attorneys' fees and costs;

4)    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated:  March 25, 2011
        Washington, D.C.

                           Lorelie S. Masters (D.C. Bar No. 358686)
                           Martina E. Vandenberg (D.C. Bar No. 476685)
                           JENNER & BLOCK LLP
                           1099 New York Avenue, N.W.
                           Suite 900
                           Washington, DC  20001
                           Telephone:  (202) 639-6000
                           Facsimile:  (202) 639-6066
                           Email:  Mvandenberg@jenner.com


                           *Counsel for Plaintiffs, Carnisah Calim, Aniway*
                           *Judavar, Marivic Desuasido, and Judith*
                           *Fuentes Pareja*